AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>VINCENT JORDAN,<br>aka "Vinnie Mac" | DOCKET NO.<br>**13-2423M**<br><br>MAGISTRATE'S CASE NO. |
|---|---|

Complaint for violation of Title 18, United States Code, Section 2422(a)

| NAME OF MAGISTRATE JUDGE<br>HONORABLE VICTOR B. KENTON | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE On or About<br>March 2013, And on or<br>About August 15, 2013 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[18 U.S.C. § 2422(a)]

Between in or about March 2013, and on or about August 15, 2013, in Los Angeles County, within the Central District of California, and elsewhere, defendant Vincent Jordan, also known as "Vinnie Mac," knowingly persuaded, induced, enticed, and coerced Jane Doe 1, an individual who is over 18 years of age, to travel in interstate commerce, from Texas to California, to engage in prostitution.

LODGED

2013 AUG 30 PM 12: 30
CLERK, U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

FILED
CLERK, U.S. DISTRICT COURT
AUG 30 2013
CENTRAL DISTRICT OF CALIFORNIA
BY ____ DEPUTY

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>NICOLE R. JOHNSON<br><br>OFFICIAL TITLE<br>Special Agent – Homeland Security Investigations |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br><br>VICTOR B. KENTON | DATE<br>August 30, 2013 |
|---|---|

(1)  See Federal Rules of Criminal Procedure 3 and 54
(2)  AUSA Patricia A. Donahue  x10640          REC: Detention

## AFFIDAVIT

I, Nicole R. Johnson, being duly sworn, hereby depose and say:

1.    I am a Special Agent ("SA"), with the United States Department of Homeland Security, Homeland Security Investigations ("HSI") and have been so employed since November 2008. Through my employment, I have received formal training in the investigation and prosecution of cases involving violations of both federal customs and immigration laws. I am currently assigned to the Human Smuggling and Trafficking Unit, Group II in Long Beach, California.  This unit conducts investigations relating to the alleged illegal entry and/or smuggling of undocumented/illegal aliens into and throughout the United States, as well as investigations into the trafficking of persons for the purpose of slavery, forced labor, involuntary servitude and sexual exploitation.

2.    During my career in law enforcement, I have participated in many criminal investigations as a case agent or in a subsidiary role.  I have debriefed numerous defendants, informants, witnesses and victims who had personal knowledge regarding criminal organizations.  I have also participated in many aspects of criminal investigations including undercover operations, surveillance, search warrants, pen registers, and wiretaps. I am also a certified Victim Assistance Coordinator

that is trained to interview victims and aid victims in necessary services. I am also familiar with the methods employed by alien smugglers and traffickers, including the recruitment, distribution, housing and transportation of aliens and victims, and the collection and concealment of proceeds of alien smuggling and trafficking.  I have conducted investigations involving the bringing in and harboring of aliens, forced labor, and sexual exploitation of victims and other federal crimes where the motivation to commit the crime has been financial profit.

3.    I have completed the HSI Advanced Human Smuggling and Human Trafficking Training Program at the Federal Law Enforcement Training Center in Brunswick, Georgia. This two week course detailed federal criminal law, victim services and case studies that involved the human trafficking of adults and minors for the purpose of labor, juvenile prostitution, and the sex trafficking of children. I have investigated and have assisted other agents in investigations, and have received training involving child pornography, child exploitation, and child prostitution offenses. In the course of my work, I have reviewed numerous examples of child pornography in many forms of media, including computer and cell phone storage media.

4.    Through my training and experience, I have become familiar with the methods of operation and techniques employed

by individuals involved in the human trafficking of minors.  An
individual involved in the human trafficking of minors will use
several methods to persuade the minor to become a prostitute
which include but are not limited to: initiating a romantic
relationship, charismatic persuasion, or violent force.  The
individual will continue to perpetuate his/her control over the
minor using coercion, deceit, fraud, force, violence and/or
threats to maintain control over and restrict the liberty of the
minor.  I am also familiar with how cellular telephones,
computers, and the Internet are used by different parties
involved to conduct illicit activities of sex trafficking.

5.   Through my training and experience, I have become
familiar with the methods of operation employed by people
involved in child prostitution and child pornography. This
includes the ways people who are involved with child
prostitution frequently possess, produce, distribute, and view
child pornography. Usually, the victim is either photographed or
videotaped having sex with the "pimp" or engaged in other types
of sexual activity. I have attended training classes and
seminars concerning computer crimes and the sexual exploitation
of children on the Internet. I have consulted with my colleagues
who have many years of experience investigating child
prostitution, child pornography, and child exploitation cases.
I have also participated in the execution of multiple search

3

warrants, many of which involved child exploitation, child pornography, and/or child prostitution offenses.

## PURPOSE OF THE AFFIDAVIT AND BACKGROUND

6.    This affidavit is made in support of an arrest warrant and complaint charging VINCENT JORDAN, also known as "VINNIE MAC," (herein "JORDAN") with violating Title 18, United States Code, Section 2422(a), inducement to travel in interstate commerce to engage in prostitution.

7.    The facts set forth in this affidavit are based upon my training and experience, and information provided to me by officers from the Long Beach Police Department.  This affidavit is intended to show that there is sufficient probable cause for the requested warrant and complaint, and does not purport to set forth all of my knowledge of, or investigation into, this matter.

8.    Based on my training and experience, and my conversations with law enforcement agents who are experienced in investigating prostitution, I am aware of the following traits of prostitution.

9.    Individuals who, through enticement, intimidation, or force, enlist individuals to become prostitutes, and who profit from the prostitution of others, are called "pimps."  Pimps are sometimes euphemistically referred to as "management."  The "Game" is a term commonly used on the streets to refer to the

4

lifestyle of pimping and prostitution.  The term "choose up" is street vernacular for a prostitute choosing to work with a particular pimp.

10.  The term "track" describes an area where the business of prostitution is commonly acknowledged to be conducted, with initial interactions occurring on the street.  The term "in-call" or "in-call date" describes a paid sexual encounter with a prostitute that usually takes place in a hotel or residence. Prostitutes and/or pimps often stay in motels/hotels for the purposes of conducting pimping, pandering, and/or prostitution activities when they travel or when they conduct prostitution locally.

11.  The term "bottom" or "bottom bitch" is used to describe the most loyal and right-hand prostitute to the pimp. The term "daddy" is commonly used by prostitutes when referring to their pimp.  The pimp's cellular telephone number is often programmed as "daddy" in the prostitute's cellular telephone. The use of cellular telephones facilitates pimp control by allowing pimps to easily maintain contact with their prostitutes.

12.  Pimps, as well as prostitutes who are not "managed," have embraced the Internet as a means of advertising for services and communicating with customers.  Certain web sites have been created to facilitate communication between

5

pimps/prostitutes and their clients.   A few of the more notable web sites relevant to prostitution in the Central District of California include backpage.com, craigslist.com, myredbook.com, and humaniplex.com.   These web sites allow pictures to be posted as part of advertisements.   I have viewed prostitution advertisements on backpage.com and craigslist.com, and other members of the task force have informed me that they have viewed prostitution advertisements on myredbook.com and humaniplex.com.

13.   Pimps at times use physical force and/or fear to control the prostitutes, a term referred to as "pimp control." Pimps control their prostitutes' actions and collect all monies earned through acts of prostitution.

14.   Pimps utilize the monies earned during acts of prostitution to purchase food, lodging, clothing, and other items.

15.   Often prostitution clients will come to a motel/hotel room to conduct the sex act with the prostitute, and the pimp will leave the hotel room until the sex act has been completed.

## THE INVESTIGATION

16.   On August 15, 2013, I received a telephone call from Long Beach Police Department ("LBPD") Vice Detective Toby Benskin.   Detective Benskin said that a minor victim, hereinafter referred to as Jane Doe 2, and an adult victim, hereinafter referred to as Jane Doe 1, of human trafficking had

6

been encountered in Long Beach, California, prostituting for a pimp named JORDAN, also known as "VINNIE MAC."

17. Based on reading the LBPD reports and my conversations with Detective Benskin, I learned that Jane Doe 2 was initially encountered by LBPD detectives on the Long Beach Boulevard track that runs through Long Beach and Compton. Jane Doe 2 stated that she was 17 years old, that she was working for a pimp who also had another girl working for him at the Luxury Inn Motel in Long Beach, and that the other girl was utilizing Myredbook.com to conduct in-call dates.

18. Based on reading the LBPD reports and my conversations with Detective Benskin, I learned that on Myredbook.com, LBPD Detectives found the advertisement for the girl identified by Jane Doe 1, and LBPD Detectives called the phone number in that ad to set up an in-call date. Once the date was set up, Detective Benskin, in an undercover capacity, went into room #205 for an in-call date. Jane Doe 2 was inside room # 205, and Jane Doe 2 offered commercial sex acts in exchange for money. LBPD apprehended Jane Doe 2 and JORDAN, who was located in a nearby stairwell outside the motel room acting as a look-out for Jane Doe 2's in-call dates. LBPD took JORDAN and Jane Doe 2 to the LBPD headquarters.

19. LBPD Detectives interviewed Jane Doe 1 and learned the following:

7

a.   Jane Doe 1 moved to California when she was 20 years old to live with a friend. She did not move to California with the intent to prostitute herself. She knew nothing about prostitution or the culture until she had a falling out with her friend. At that time, she left her friend's house and began walking the streets in West Hollywood, and she met a man who was willing to help her by letting her stay at his house. The man and his nephew said that she must help contribute financially and suggested she engage in prostitution to make money. They took her to the Sunset track and that is when she was introduced to the game. She has worked for several different pimps who beat her. She had a child with one of the pimps, who was later killed by a rival street gang.

b.   In 2008, after getting off at the Long Beach Boulevard and Broadway metro station, Jane Doe 1 and another prostitute were approached by JORDAN and his pimp partner. When approached, JORDAN told her that he wanted her to choose up.

c.   JORDAN gave Jane Doe 1 a quota of $500 a day, and she worked all week. JORDAN would take her to the Western track and she would make good money, sometimes up to $1,500. JORDAN would take the money from Jane Doe 1 after each prostitution deal. This continued on from 2008-2010, and she did not know how much money total she earned for him. One tactic that JORDAN used to keep the girls in check was to take away the girls'

identification cards and clothes to prevent them from leaving him.

    d.   In 2010, JORDAN's brother was arrested for an unknown reason and his girlfriend began to stay with JORDAN and Jane Doe 1. Jane Doe 1 did not like that she had to prostitute on the streets all day while the girlfriend stayed at home. JORDAN did not like that Jane Doe 1 had complained and so he struck her in the head with the heel of his shoe approximately 10 times. Jane Doe 1 left JORDAN and said she would not return. JORDAN told her that she must now work with his pimp partner "Boss." Jane Doe 1 worked for Boss for only a few days, until she saw him beat a white female prostitute unconscious. Shortly after she left BOSS, she moved to Texas to get away from the prostitution culture.

    e.   JORDAN told Jane Doe 1 that he is a member of the Insane Crips street gang. She is unaware of his gang moniker but he is known on the streets as "VINNIE MAC." Jane Doe 1 also referred to JORDAN as "Daddy."

    f.   JORDAN began calling Jane Doe 1 approximately 4-5 months ago, when JORDAN's pimp partner saw her online ad on Myredbook.com. JORDAN looked up her ad and found her current phone number. JORDAN and Jane Doe 2 (at JORDAN's request) would call Jane Doe 1 and attempt to recruit her to move from Texas to California and work for JORDAN again as a family. He would call

9

repeatedly and tell Jane Doe 1 that he had big plans in the works and mentioned the West Coast Players Ball (a pimp party that JORDAN was throwing). Additionally, JORDAN told Jane Doe 1 that he had several houses and cars that he had purchased from all the money he was making.

g. Jane Doe 1 finally returned to California after JORDAN threatened to tell all the pimps at the West Coast Players Ball that she was a "snitch." Jane Doe 1 believed the threats because JORDAN knows her real name and all of her personal information. Jane Doe 1 believed that the consequences of not returning to work for JORDAN would mean that she "will end up dead somewhere."

h. JORDAN told Jane Doe 1 that she needed to bring him a "choose up" fee [money paid to the pimp by the prostitution as a fee for employment under the pimp] prior to arriving in California. JORDAN sent Jane Doe 1 approximately $65.00 and $270.00 via Western Union transfer to get her back to California. Additionally, JORDAN paid for a hotel room in Texas for Jane Doe 1 to use to make the money for the $600.00 choose up fee. JORDAN sent the money in his name to Jane Doe 1 in her name. She believed the money may have come approximately 10 days prior. Once she arrived in California, she gave JORDAN the $600.00 the he required her to pay him.

10

i.   When Jane Doe 1 came to California, JORDAN told her that she would be working the Long Beach Boulevard track between the hours of 0400-0700, because law enforcement did not work the girls at those hours. JORDAN also instructed her to kiss the Johns on the lips, because undercover cops were not allowed to kiss the girls on the lips.  This would help her identify law enforcement.  Jane Doe 1 she felt like she was better suited to work in a motel room doing in-call dates from online than walking the streets.

j.   JORDAN provided all of the girls with "ICON" brand condoms to use during their dates.

k.   Jane Doe 1 in the past and present has advertised online for commercial sex acts by using Backpage.com, Myredbook.com, and Humaniplex.com.

l.   On August 13, 2013, JORDAN and his pimp partner drove Jane Doe 1 and Jane Doe 2, in a burgundy colored Cadillac, to the Luxury Inn Motel in Long Beach so that the two girls could work the area prostituting. JORDAN told Jane Doe 1 to get the room in her name.

m.   On August 14, 2013, Jane Doe 1 had approximately 8 dates. She had 6 dates that lasted a half an hour at rate of $140.00. She had 2 dates that lasted an hour at the rate of $200.00. She made approximately $1,250.00 that day. She would give over all the money to JORDAN after each date. JORDAN would

11

take the money and place it towards the West Coast Players Ball. However, she did not know where he kept that money. If Jane Doe 2 was in the room, Jane Doe 1 would offer her internet customers a threesome, but they all declined.   At times, Jane Doe 1 would go into the bathroom and wait for Jane Doe 2 to finish her dates in the room.   On one occasion, a John paid extra money for Jane Doe 1 to watch him and Jane Doe 2 have sexual intercourse.

n.   Jane Doe 1 has seen other girls with JORDAN'S moniker "VINNIEMAC" tattooed on them.   Jane Doe 1 does not have his name tattooed on her, even though JORDAN asked her to get one of his name.   Jane Doe 1 identified the other girls, including Jane Doe 2, working under JORDAN by their streets name.   Jane Doe 1 was told that the girls were all originally from Las Vegas. She was also shown a picture of a white female whose name she was unaware of.   Jane Doe 1 identified Jane Doe 2 as the bottom bitch.

o.   On August 14, 2013, Jane Doe 1 observed, on separate occasions throughout the day, Jane Doe 2 hand JORDAN $600.00 from her prostitution deals.   Jane Doe 1 stated that Jane Doe 2 sent JORDAN a text saying that she wanting to stop "hoeing" because she was beginning to think it was morally wrong.   JORDAN called Jane Doe 2 back, via cell phone, and threatened to beat her if she did not come back to him.   Jane Doe 2 texted him saying that if he continued to threaten her,

12

she would call the police. She then texted him his real name,
date of birth, and his mother's home address, which apparently
angered JORDAN even more.

      p.   Jane Doe 1 had sexual intercourse with JORDAN
approximately 6 times prior to 2010. She stated he tried to have
sex with her a few days prior to August 15, 2013, and she
refused his advances. Jane Doe 1 learned from Jane Doe 2 that
Jane Doe 2 and JORDAN were engaged in a sexual relationship.

      q.   Jane Doe 1 was told that Jane Doe 2 was 19 years
old. Jane Doe 1 stated that Jane Doe 2 carried herself well and
could hold conversations.  Jane Doe 1 was unaware that Jane Doe
2 was 17 years old.  Jane Doe 1 stated that back in 2008, when
Jane Doe 1 initially worked under JORDAN, he would check the
identification cards of all the girls for the sole purpose of
determining their ages, including her own.  Jane Doe 1 said she
had previously been JORDAN's bottom bitch and knew what his
techniques were for operating his girls. In her opinion, JORDAN
knew Jane Doe 2's real age because he is accustomed to checking
identifications.

      r.   Jane Doe 1 was aware of the tattoo of JORDAN's
moniker "VINNIE MAC" across Jane Doe 2's midsection.  Jane Doe 1
has also seen the tattoos on the other girls that had worked for
JORDAN.  All of the girls had tattoos that said "VINNIEMAC." In

the past few days, JORDAN had told Jane Doe 1 to get his street name tattooed on her but she refused.

s.    Jane Doe 1 described the West Coast Players Ball as an event where pimps and celebrities enjoy the company of prostitutes.  Awards are presented to pimps and the girls entertain the celebrities by performing sexual acts on them in exchange for money.  JORDAN expected Jane Doe 1 to work at the 2013 West Coast Players Ball by handing out trophies to pimps and engaging in sexual acts for money.

t.    On August 15, 2013, Jane Doe 1 received a phone call from a John [Detective Benskin acting in an undercover capacity] looking for a date. She was in room #205 at the Luxury Inn Motel and had asked JORDAN to be the "look-out" for her while she performed her date and to notify her via cellular phone if anyone seemed like a problem.  JORDAN said yes and went outside to watch the parking lot to notify her of anything suspicious.  In the event that JORDAN thought that anything was suspicious, he would call Jane Doe 1 and tell her, and she would give the John the wrong room number. JORDAN left the room and called her saying that there was a white male wearing sunglasses approaching the room.  Shortly after, his phone was disconnected. She thought that this was odd.

u.    LBPD showed Jane Doe 1 a Department of Motor Vehicles (DMV) photograph and she identified the photograph as

14

VINCENT JORDAN, aka VINNIE MAC. She initialed and dated the DMV photograph.

20.    LBPD found and seized one AT&T Smartphone in the Luxury Inn Motel room where Detective Benskin had met Jane Doe 1 for the in-call date that they had arranged.   LBPD seized that phone. ICON condoms were recovered from Jane Doe 2 and Jane Doe 1 on both dates set up by LBPD Detectives, and ICON brand condoms were recovered from the Luxury Inn Motel, room #205, where Jane Doe 1 was encountered.

21.    LBPD apprehended JORDAN because he was seen leaving room #205 by Detective Benskin, the same room that Jane Doe 1 instructed him to go to.

22.    LBPD Detectives and I interviewed JORDAN and among other things, he stated the following:

a.    LBPD Detectives asked JORDAN if he understood his rights and JORDAN acknowledged being read his rights by LBPD transporting officers and stated that he understood them.   LBPD Detectives checked with the transporting officers, who stated that they read him his rights and he said "yes" to waiver number 1, LBPD Miranda Rights form 1000.0080.

b.    JORDAN was shown a black briefcase that was found in room #205 at the Luxury Inn Motel and he stated that it belonged to him.   He was asked if we could search it and he gave

15

verbal consent. Additionally, JORDAN was asked to sign a waiver form for the consent to search, which he signed willingly.

      c.   He stated that he was hosting the Players Ball and was out on the track selling tickets. He stated that he approached Jane Doe 1 in room #205 to sell her a ticket but had never met her prior to today.  Moments later, JORDAN stated that Jane Doe 1 owed him $65.00 that he wired to her in Texas.  He was asked why he sent money to someone he did not know and he stated that his girlfriend made him. Shortly after this statement, he stated that he thought Jane Doe 1 was "gay" and trying to steal his girlfriend. Approximately 15 minutes into the interview, JORDAN stated he had known JANE DOE 1 for approximately four months.

      d.   JORDAN stated that he also had made a master calendar that contained information about the radio stations in different cities and states that were advertising the Players Ball for him.

      e.   He later admitted to having Jane Doe 1's phone number in his phone.  JORDAN denied having sex with JANE DOE 1 when asked about their relationship.  JORDAN was asked if he had met JANE DOE 1 five years ago and he stated, "That would be a goddamn lie." Moments later, he said, "Well maybe, maybe."

      f.   JORDAN stated he did not know Jane Doe 2's real name, and that it was a coincidence that Jane Doe 2 had the same

16

last name as his.  He denied teaching Jane Doe 2 about The Game. He denied knowing she was 16 years old when they first met and stated, "I know nothing about that, sir."

      g.   When asked why Jane Doe 2 had a tattoo of his name across her stomach he stated, "Cause that's my move." He stated that she wanted to get a tattoo like his and then he showed his arm that also had "VINNIE MAC" tattooed on it. He stated a Hispanic male came over to his house and gave her the tattoo.

      h.   JORDAN denied that Jane Doe 2 was his bottom bitch.

      i.   He stated that he and Jane Doe 2 came from Fresno together and he paid for the Greyhound bus tickets with cash.

      j.   He denied knowing girls identified by Jane Doe 1 as having worked for him.

      k.   He denied ever hitting any of the girls.

      l.   He admitted to knowing a pimp named "China P" because he is throwing the Players Ball and they are old Crip friends.

      m.   He denied renting any motel room on Long Beach Boulevard, he denied being called "daddy" by any girl, and he denied buying clothing or "hoe clothing" for the girls.

      n.   He denied taking any of the girls to a prostitution track.

o.    He denied knowing of any prostitution tracks. He said everything is a lie.

p.    JORDAN claimed he was at the Luxury Inn Motel looking for his girlfriend (JANE DOE 2) and that he arrived around 0930 hours. He said he had never entered room #205 because no one opened the door.  He stated that he was sitting in the stairwell just prior to LBPD arriving because he was calling and texting his girlfriend but she was not answering. Detective Benskin stated that saw JORDAN exiting room #205 and JORDAN then changed his story and admitted to being in the room. He was asked if he heard JANE DOE 1 on the phone with a John and he said he did not know.  When asked if JANE DOE 1 was a prostitute, he stated "She didn't have any hoe clothes on." When asked if he knew that Long Beach Boulevard was a known track for prostitution, he stated "no." When asked if he lived in Long Beach, he stated, "I haven't lived in Long Beach in 10 years."  When asked if he knew that the Luxury Inn Motel was a common motel used in prostitution deal, JORDAN stated "I don't know.  Back then, I was a crip and we didn't come up here." JORDAN stated he was at the Luxury Inn Motel the prior night looking for JANE DOE 2 because she had left him on August 14, 2013.

q.    When asked if he was a pimp, JORDAN responded by saying "I represent myself as a Professional Individual Making

18

Progress (PIMP)."   JORDAN later denied being a pimp and knowing anything about the lifestyle. He said he attends pimp events and films them, selling DVD's.

      r.   JORDAN said he never posted any ad online advertising girls for prostitution, and he denied every gaining financially from acts of prostitution.

      s.   He denied ever receiving money from either JANE DOE 2 or JANE DOE 1.

      23.   On August 15, 2013, during the consensual search of JORDAN's briefcase, I found a Western Union receipt inside the briefcase.   The sender on that receipt was Vincent Jordan in Fresno, California, and the receiver was Jane Doe 1 in Texas. The receipt was in the amount of $77.00 total, $65.00 to be paid to Jane Doe 1, and $12.00 in fees.

      24.   Western Union provided information in response to a subpoena.   I reviewed that information and learned that on August 4, 2013, Vincent Jordan sent $65 to Jane Doe 1, and that it was received by Jane Doe 1 on August 5, 2013.

      25.   JORDAN was born in 1960.   Jane Doe 2 was born in 1985. In 2010, Jane Doe 2 was convicted in Los Angeles County of two counts of loitering, in violation of California Penal Code Section 653.22(A), and one count of giving a false identification to a police officer, in violation of California Penal Code Section 148.9(A).   In 2006, 2008, 2009, and 2010,

Jane Doe 2 was convicted of loitering, prostitution, in violation of California Penal Code Section 647(B), and resisting arrest, in violation of California Penal Code Section 148(A)(1).

26.  On August 17, 2013, I called the shelter that was housing Jane Doe 1 to check on her well-being.  Jane Doe 1 informed me that she had received several calls and text messages that were threatening in nature.  She stated that she thought that Jane Doe 2 had spoken with JORDAN's son, also an alleged pimp in Fresno, and told JORDAN's son that Jane Doe 1 was cooperating with police in the case against JORDAN.  Jane Doe 1 stated that other pimps or associates in Los Angeles had received word that Jane Doe 1 was cooperating with police, and that they had attempted to also threaten or intimidate her via phone calls or text messages. I asked Jane Doe 1 if she had retained the text messages and she stated that she had deleted them but had unsuccessfully attempted to record one of the phone conversations that she thought was important.

27.  On August 21, 2013, I called the shelter that was housing Jane Doe 1 to check on her wellbeing.  At this time, I was informed that Jane Doe 1 had left the shelter.  I asked why she had left the shelter, and I was informed that she was engaged in a phone conversation with another service provider and became upset. She requested the shelter drop her off at a Greyhound bus station.

28.   On August 21, 2013, I called Jane Doe 1, and she did not answer her phone.  Moments later she called me back and we began speaking about why she left the shelter.  Jane Doe 1 stated that she did not want to help in the case any longer because it was not worth the potential danger to her life.  I asked her what she meant by that, and she said that she did not want to risk her life and help with the case by testifying with the potential that she would be in danger or hurt by someone associated with JORDAN or by JORDAN himself.

29.   I have reviewed subscriber and toll records for the numbers associated with phones seized from JORDAN and from Jane Doe 1, and have learned that between June 8, 2013, and August 16, 2013, there were over 200 contacts between his number and her number.

30.   Based on the foregoing, I respectfully submit that there is probable cause to believe that VINCENT JORDAN, also known as "VINNIE MAC," violated Title 18, United States Code, Section 2422(a), inducement to travel in interstate commerce to engage in prostitution.

_____
NICOLE R. JOHNSON
Special Agent
Homeland Security Investigations

Subscribed and sworn to before
me on this ʒ⁶ day of August,
2013.

_____
VICTOR B. KENTON
THE HONORABLE VICTOR KENTON
UNITED STATES MAGISTRATE JUDGE